IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:20-CV-252-FL

| | |
|---|---|
| MAMIE HANSLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| LOUIS DEJOY, in his official capacity as ) | |
| Postmaster General, U.S. Postal Service, ) | |
| Agency, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on defendant's motion for judgment on the pleadings. (DE 31). Plaintiff responded in opposition, and the issues raised are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this employment discrimination action on December 21, 2020, and filed an amended complaint with leave of court on August 16, 2021,[1] asserting claims of race discrimination, hostile work environment, and retaliation, against defendant, her employer, arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Plaintiff seeks a jury trial and other relief as may be appropriate, including injunctive relief, damages, costs and fees.

---

[1] The court dismissed plaintiff's original complaint for improper service and for failure to state a claim, upon defendant's motion, allowing plaintiff leave to file an amended complaint. See Aug. 2, 2021, Text Order.

In the instant motion, defendant seeks dismissal of plaintiff's claims for failure to state a claim on which relief can be granted, relying upon plaintiff's administrative complaint, Equal Employment Opportunity ("EEO") filings, and defendant's administrative decisions. Plaintiff relies upon her complaint in opposition to the motion.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint[2] may be summarized as follows. Plaintiff is a black female who has been employed by defendant for more than twenty years as a rural letter carrier in Pender County, North Carolina. (Compl. ¶¶ 1, 19). During the time period at issue in the complaint, plaintiff's supervisor was Kathleen Michaels ("Michaels"), a white female in the position of postmaster of the location in which plaintiff worked. (Id. ¶ 20). Plaintiff describes in the complaint actions by Michaels in supervising plaintiff's work, between October 2016 and November 2017.

On October 25, 2016, plaintiff asked Michaels, while on the workroom floor, what the procedure would be if she would be unable to return to the office by 5:00 p.m. due to an anticipated heavy workload. Michaels allegedly "responded in a sarcastic and rude tone, 'What's the problem, don't you know your route?'" (Id. ¶ 24). "Taken aback by Michaels' tone and comment, [p]laintiff then asked Michaels whether she had done something to offend Michaels[;] [i]f she had, [p]laintiff would apologize." (Id. ¶ 25). "Michaels responded by telling [p]laintiff to 'shut up and continue working.'" (Id.). "In response, [p]laintiff was shocked and began crying[;] [t]his exchange between [p]laintiff and Michaels was witnessed by her co-workers." (Id. ¶ 26).

On October 28, 2016, while driving her route, two of plaintiff's tires "went punctured by a piece of metal in the road and went flat, as a result, [p]laintiff's car was towed." (Id. ¶ 27). When

---

2  Hereinafter, all references to the complaint or "compl" in citations are to the first amended complaint, unless otherwise specified.

2

plaintiff reported the incident to Michaels, Michaels told her, "it was [plaintiff's] fault because anytime a person has a flat tire, it's because that person is not looking where they are driving and needs to pay attention." (Id.). "Plaintiff was confused by this reaction and became fearful that she would lose her job based on the way Michaels was treating and talking to her[;] [t]his was a routine issue, but Michaels escalated the issue and immediately blamed [p]laintiff for something that was outside of [p]laintiff's control." (Id. ¶ 28).

On October 31, 2016, plaintiff's car would not start after she stopped to deliver a package on her route. "In fear of being yelled at based upon her prior experiences with Michaels, [p]laintiff called Michaels to report the issue she was having with her car, as well as that she would need someone to pick up the outgoing mail in [p]laintiff's possession, so [p]laintiff could focus on getting her car fixed." (Id. ¶ 29). "Michaels denied [p]laintiff's request for someone to pick up her outgoing mail in her possession." (Id. ¶ 30). When white mail carriers "had car trouble during their respective routes, Michaels sent Lillie Brown to assist them, but did not send anyone when [p]laintiff had car trouble." (Id. ¶ 31). "Plaintiff's husband came and repaired the vehicle, so [p]laintiff could continue her route." (Id.).

Sometime "[p]rior to December 7, 2016, [p]laintiff had filed a grievance against Michaels based on the [alleged] treatment she was enduring." (Id. ¶ 50). "On December 7, 2016, Michaels screamed at [p]laintiff to perform a task that two of her [white] co-worker[s] had refused to perform, which required lifting heavy packages." (Id.). "Plaintiff had two (2) carts and a buggy full of packages," and other white "employees were not yelled at for doing the same thing [p]laintiff was doing at the same time she was yelled at." (Id. ¶ 32). "Plaintiff became upset and began to cry[;] [p]laintiff then called her union representative, and after their conversation, but still

3

upset, [p]laintiff attempted to continue to carry out her job duties and deliver packages[;] [i]n doing so, [p]laintiff was injured while lifting a heavy package." (Id. ¶ 51).

"On December 8, 2016, Michaels called [p]laintiff in for an accident investigation; [p]laintiff expressed that she was uncomfortable being alone with Michaels because the way Michaels had treated her in the past, so [p]laintiff's supervisor sat in on the investigation." (Id. ¶ 52). "Michaels intentionally elongated the 'investigation' for an unreasonable four and a-half (4.5) hours by requiring [p]laintiff, who was in obvious pain, to repeatedly re-enact how the injury occurred." (Id. ¶ 53). According to plaintiff, "[t]he 'investigation' became so ridiculous that [p]laintiff's supervisor, Mr. Monaghan ['Monaghan'], on multiple occasions, assumed that the investigation was over and left[;] [p]laintiff had to call him back." (Id. ¶ 54). "Finally, after 4.5 hours of investigation, Michaels finally dismissed [p]laintiff and told her to go to Urgent Care." (Id. ¶ 55). "Plaintiff was put on light duty after the December 7, 2016 incident." (Id. ¶ 56). Michaels "refus[ed] to give [p]laintiff a copy of the accident report when [p]laintiff requested it." (Id. ¶ 57). At least one other black female carrier (Lillie Brown) was "subjected to the same treatment when dealing with Michaels after being involved in an accident investigation." (Id. ¶ 58). Only plaintiff and other black employees allegedly were "subjected to intentional and unnecessarily long accident investigations." (Id. ¶ 59). Based on the "unnecessarily long accident investigation, [p]laintiff filed a grievance against Michaels and contacted Michaels' supervisor." (Id. ¶ 60).

"On January 31, 2017, while off the clock and attending a family function, Michaels called [p]laintiff[;] [d]uring that telephone call, Michaels yelled at [p]laintiff and spoke to her in a demeaning manner." (Id. ¶ 33). "This exchange was overheard by several of [p]laintiff's family

4

members, which caused them to question [p]laintiff about the telephone call and why her supervisor would talk to her in that manner." (Id.).

"On February 1, 2017, Michaels approached [p]laintiff and asked about a specific customer's mail delivery[;] [p]laintiff had not worked the route where the specific customer lived for the past three (3) months, and as a result, [p]laintiff told Michaels she could not answer her question. (Id. ¶ 34). "Michaels responded in a sarcastic and combative manner." (Id.) Witnesses to this exchange included plaintiff's white co-worker who stated, "Damn girl, she got it in for you. Boy, I'm glad I'm White." (Id. ¶ 35). According to the complaint, "[i]t was obvious to that co-worker that [p]laintiff was being treated differently than her [white] co-worker[s] because of her race." (Id.).

On February 3, 2017, 49 days after "Michaels admitted that she became aware of [p]laintiff's EEO complaint activity and [57] days after becoming aware of [p]laintiff's December 7, 2016, injury and the circumstances surrounding that injury, [p]laintiff was issued a Letter of Warning, by Monaghan, for failure to work in a safe manner and failure to report an accident." (Id. ¶ 61). "Monaghan reported directly to Michaels and controlled her direction[;] Monaghan [issued the] untimely Letter of Warning, at the direction of Michaels," who allegedly "concurred with the Letter of Warning" discipline. (Id. ¶¶ 62-64).

That same date, Michaels, "knowing that [p]laintiff was on light duty, demanded that Plaintiff finish her assigned tasks before the substitute carrier came in to work." (Id. ¶ 36). "Michaels informed [p]laintiff that she expected her to have the mail sorted, packages flagged, and mail pulled down and ready to be delivered by the time the substitute carrier arrived." (Id.). "Plaintiff inquired of Michaels if she realized that she was on light-duty and performing the

5

requested tasks were against the lifting and weight restrictions given her by her doctor[;] Michaels responded she did not care and that she needed the mail and packages ready." (Id. ¶ 37).

"On May 23, 2017, Michaels told [p]laintiff that her doctor said she could drive up to two (2) hours; [p]laintiff showed Michaels that her doctor, on that date, had said 'No Driving'; Michaels responded, 'you can drive two hours.'" (Id. ¶ 39).

"On May 30, 2017, after [p]laintiff had signed out, she sat at the back door a moment to rest her back before heading to her car; Michaels asked [p]laintiff to leave the premises when other co-workers on the same schedule were not asked to leave." (Id. ¶ 40). According to the complaint, may of plaintiff's white "co-workers would stand around talking as much as an hour after signing out and Michaels says nothing to them about the same." (Id. ¶ 38).

On June 13, 2017, Michaels told plaintiff "if she was not talking about work, then she didn't want her speaking at all." (Id. ¶ 41). Plaintiff's white co-workers were not told the same, and to plaintiff's knowledge "there is no rule or policy stating the same; [p]laintiff was singled out." (Id.).

On October 23, 2017, "Michaels instructed [p]laintiff that she had to get permission anytime that she walked away from her desk[;] [p]laintiff was informed if she did not, her failure to comply would be considered disobeying a direct order." (Id. ¶ 42). "Each time [p]laintiff had to use the bathroom, Michaels had to approve it; [p]laintiff was not allowed to walk the workroom floor; [n]one of [p]laintiff's [white] co-workers were required to get permission to leave their desk, go to the bathroom, or prohibited from walking the workroom floor." (Id. ¶ 43). "When [p]laintiff took breaks recommended by her doctor, Michaels would nevertheless have to approve it; [w]hen [p]laintiff did take a break, she was required to go to the table in the corner of the building and prohibited from going outside. (Id. ¶ 44). "None of [p]laintiff's [white] co-workers were required

6

to take their breaks at the table in the corner or were prohibited from going outside for their break" like plaintiff. (Id. ¶ 45).

On November 17, 2017, "during a driver observation, Michael[s] accused [p]laintiff of talking on her cell phone[;] Michaels look inside [p]laintiff's car and saw a cell phone on the passenger seat and accused [p]laintiff of talking on it; [p]laintiff was not talking on the cell phone." (Id. ¶ 46).

"The aforementioned incidences left [p]laintiff afraid of interacting with Michaels[;] [t]hose feelings were exacerbated by the fact that [p]laintiff's co-workers witnessed the way Michaels treated [p]laintiff as it was obvious [p]laintiff was being treated differently because of her race," according to the complaint. (Id. ¶ 47). Plaintiff further alleges that "Michaels' actions of yelling at, threatening, demeaning, and degrading employees were only directed" towards plaintiff and other black employees. (Id. ¶ 48).

## COURT'S DISCUSSION

A. Standard of Review

A motion for judgment on the pleadings is evaluated under "the same standard as a 12(b)(6) motion to dismiss." Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of

7

further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).³

B.  Analysis

    1.  Hostile Work Environment

"A hostile environment that violates Title VII exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Holloway v. Maryland, 32 F.4th 293, 300 (4th Cir. 2022). "[T]o state a hostile work environment claim, [a plaintiff] must allege that: (1) [s]he experienced unwelcome harassment; (2) the harassment was based on [her] race or protected activity; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Id.

Regarding the second element, the court "may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 409 (4th Cir. 2022). "But a plaintiff cannot rely on her own conjecture to impute a racial character to what appears to be neutral harassment." Id.

Concerning the third element, "plaintiffs must clear a high bar in order to satisfy the objective severe or pervasive test." Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019). "Objective analysis of whether a workplace is hostile and abusive looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically

---

³     Internal citations and quotation marks are omitted from all citations unless otherwise specified.

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." McIver, 42 F.4th at 407. "The status of the harasser is also a significant factor to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious." Id. at 408. Nevertheless, "incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." Perkins, 936 F.3d at 208. "Rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII." Id. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. "The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Id.

Here, plaintiff fails to allege facts giving rise to a plausible inference of a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to the conditions of plaintiff's employment. Holloway, 32 F.4th at 300. As an initial matter, multiple incidents alleged by plaintiff to be harassing give rise to no inference that they were based upon race or protected activity. For example, plaintiff alleges no facts tying alleged incidents taking place on October 25, 2016, October 28, 2016, January 31, 2017, February 1, 2017, February 3, 2017, May 23, 2017, and November 17, 2017, to race or protected activity. Further, unlike in other cases involving hostile work environment based on race, there are no alleged racially derogatory comments, and no references to race or prior protected activity, by the alleged harasser in any of the incidents described in the complaint. See, e.g., Laurent-Workman v. Wormuth, 54 F.4th 201, 212 (4th Cir. 2022) (noting that "the sort of workplace behaviors that Title VII serves to root out [are] repeated invectives of an overtly racial tenor"). Moreover, absent more

9

specific allegations of comparison, the court need not credit plaintiff's conclusory allegation that her supervisor's allegedly abusive conduct was "only directed towards [p]laintiff and other [black] employees," (Compl. ¶ 48), nor a co-worker's statement that "I'm glad I'm White." (Id. ¶ 35); see McIver, 42 F.4th at 409.

Plaintiff suggests that several other instances of alleged harassment by her supervisor were based on race because white employees were not treated in the same way in those incidents. For example, plaintiff draws a comparison to how white employees were treated in reference to incidents taking place on December 7-8, 2016, May 30, 2017, June 13, 2017, and October 23, 2017. These comparisons may give rise to an inference of conduct on account of race. See McIver, 42 F.4th at 409.

However, none of the foregoing incidents involving a comparison to white employees, together or in combination with the other alleged incidents, are "sufficiently severe or pervasive" to meet the "high bar" of a hostile work environment claim. Holloway, 32 F.4th at 300; Perkins, 936 F.3d at 208. For example, plaintiff alleges that "[o]n December 7, 2016, Michaels screamed at [p]laintiff to perform a task that two [white] co-worker[s] had refused to perform, which required lifting [] heavy packages." (Compl. ¶ 50). Plaintiff also alleges Michaels "yelled at [p]laintiff and spoke to her in a demeaning manner," about an unspecified matter on January 31, 2017, and told her to "shut up and continue working" on October 25, 2016. (Id. ¶¶ 25, 33). Such alleged condescending language and tone, however, while rude and callous, "are not actionable under Title VII." Perkins, 936 F.3d at 208; see, e.g., Holloway, 32 F.4th at 300 (noting examples of behavior not meeting standard including a "supervisor yelling at plaintiff in one meeting, [and] yelling and pounding the desk in another meeting").

10

Additional incidents, at best, are at the level of unactionable "harping on mistakes, unfairly criticizing plaintiff, . . . and playing favorites." Holloway, 32 F.4th at 300. For example, plaintiff alleges that on December 8, 2016, she was subjected to an "unnecessarily long accident investigation," and that on May 30, 2017, and June 13, 2017, "Michaels asked [p]laintiff to leave the premises," and was told not to speak, when others were not asked to do so. (Compl. ¶¶ 40, 41, 58). Likewise, on October 23, 2017, Michaels "instructed [p]laintiff that she had to get permission anytime she walked away from her desk," and did not so instruct white employees. (Id. ¶¶ 42-43). These incidents, together or in combination, "fall[] considerably short of alleging an abusive working environment," in violation of Title VII. Holloway, 32 F.4th at 300.

In sum, plaintiff fails to allege a workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment. See id. Therefore, plaintiff's hostile work environment claim must be dismissed.

2. Retaliation

Title VII makes it unlawful for "an employer to discriminate against any of his employees . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pertaining to equal employment opportunities. 42 U.S.C. § 2003e-3(a). "This provision is sometimes referred to as the 'anti-retaliation' provision." Perkins, 936 F.3d at 206. "Three elements comprise a case for retaliation: . . . (1) that [plaintiff] engaged in a protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events." Laurent-Workman, 54 F.4th at 212.

"Regardless of the route a plaintiff follows in proving [retaliation], the existence of some adverse employment action is required." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). "An adverse employment action is a discriminatory act which adversely

11

affects the terms, conditions, or benefits of the plaintiff's employment." Id. "Conduct short of ultimate employment decisions can constitute adverse employment action." Id. at 375-76. However, "dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 431 (4th Cir. 2015). Rather, to be actionable, a plaintiff must "link such matters . . . to some material change in the conditions of his employment." Id.

With respect to causation, this element "can be shown in two ways: [1] by showing that the adverse act bears sufficient temporal proximity to the protected activity, or [2] by showing the existence of facts that suggest that the adverse action occurred because of the protected activity, or a combination of the two." Laurent-Workman, 54 F.4th at 218–19. Temporal proximity alone between an employer's knowledge of protected activity and an adverse employment action may establish causation only if it is "very close." Id. at 219. In any event, the "ultimate question" in any discrimination case is the existence of "discrimination vel non." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983).

In this case, plaintiff does not allege facts giving rise to a plausible inference of retaliation. As an initial matter, plaintiff does not identify in her complaint or in her brief in opposition to dismissal what constitutes the protected activity, and what constitutes the adverse employment action, for purposes of her retaliation claim. She alleges in the complaint that she "filed a grievance against Michaels" at some time "[p]rior to December 7, 2016," and that she "requested pre-complaint processing" October 31, 2016, was issued a notice of right to file a complaint January 27, 2017, and filed a "formal complaint" administratively on February 9, 2017. (Compl. ¶¶ 8-10, 50) (emphasis added). With respect to adverse employment actions, plaintiff suggests she was subjected to a "Hostile Work Environment" generally (Compl. p. 11), and that she "has been

12

transferred to a work schedule against her will." (Compl. ¶ 79). She also suggests that a February 3, 2017, "Letter of Warning discipline" constitutes retaliation, and that it was imposed on her 49 days after Michaels "became aware of [p]laintif's EEO complaint activity." (Compl. ¶ 62).

The foregoing allegations are insufficient to state a claim for retaliation for several reasons. As an initial matter, any claim for retaliation premised upon a hostile work environment as an adverse employment action fails as a matter of law, because plaintiff has not alleged an actionable hostile work environment claim for the reasons stated in the preceding section B.1. of this order. Next, with respect to the a claim for retaliation premised upon a different work schedule, or the "Letter of Warning discipline," (Compl. ¶¶ 62, 79), those descriptions are not sufficient, without more, to permit an inference of a "material change in the conditions of [her] employment." Adams, 789 F.3d at 431; see, e.g., Id. (noting "inconvenience or emotional anxiety resulting from a disciplinary investigation that is reasonably rooted in articulable facts justifying such an investigation [is] not sufficient"); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004) ("[R]eassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect.").

In addition and in the alternative, plaintiff has not alleged facts giving rise to a plausible inference of a causal link between filing of a "grievance against Michaels" at some time "[p]rior to December 7, 2016," or "pre-complaint processing" October 31, 2016, and the alleged adverse employment actions. (Compl. ¶¶ 8, 50). While plaintiff alleges that the Letter of Warning was issued 49 days after Michaels became aware of plaintiff's "EEO complaint activity," (Compl. ¶ 61), this time frame is not sufficient in itself to permit an inference of retaliation, particularly where the nature of the adverse employment action is not clear, and where plaintiff does not allege

13

any other facts permitting an inference of a causal link between the Letter of Warning and the EEO activity.

In sum, plaintiff's retaliation claim fails as a matter of law and must be dismissed.

## CONCLUSION

Based on the foregoing, defendant's motion for judgment on the pleadings (DE 31) is GRANTED, and plaintiff's claims are DISMISSED for failure to state a claim upon which relief can be granted. The clerk is DIRECTED to close this case.

SO ORDERED, this the 16th day of March, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge